## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>AP ORANGEVALE, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 23-10687 (CTG)<br><br>**Related Docket No. 10** |

## <u>MEMORANDUM OPINION</u>

The issue in this case is whether to grant stay relief to allow an action against the debtor currently pending in the Sacramento County Superior Court in California to go forward.  On April 7, 2023, Cable Park filed an unlawful detainer action against debtor AP Orangevale alleging, among other things, that the debtor is unlawfully occupying certain premises owned by Cable Park.[1]  The crux of Cable Park's argument is that the debtor is its tenant under a lease that expired last year.  In response, the debtor argues that its predecessor-in-interest validly exercised its option to renew the lease through 2052.  Because the lease is priced at terms that are substantially below market rates, the debtor has every reason to argue that the term of the lease has been validly extended, while Cable Park, as landlord, has every reason to argue that the lease has expired.

Trial on this matter was scheduled to commence May 30, 2023 in the California court, but the debtor filed for bankruptcy protection on May 29, 2023, thus staying the proceeding.  The debtor (unsurprisingly) seeks to assume the disputed lease

---

[1] Cable Park Property Owner, LLC is referred to as "Cable Park."  Debtor AP Orangevale, LLC is referred to as either "AP Orangevale" or the "debtor."

pursuant to 11 U.S.C. § 365.  The parties agree that the Court can only grant a motion to assume the lease if that lease in fact remains in place, such that this Court would be required to resolve, in the debtor's favor, the question otherwise pending in California in order to grant the debtor's motion to assume.[2]

Cable Park filed this motion for relief from stay to allow the California proceeding to go forward.  Alternatively, Cable Park asks this Court to stay the debtor's assumption motion or to abstain from deciding any issues relating to the disputed lease.  The Court held an evidentiary hearing on these motions on July 26, 2023 and heard the arguments of counsel on August 1, 2023.

For the reasons explained below, the Court will grant the motion for relief from stay.  By agreement of the parties, lifting the stay will serve to hold all remaining motions in abeyance pending the California Superior Court's resolution of the dispute.

### Factual and Procedural Background

The debtor's only asset is a purported leasehold interest in certain real property located in California.  The debtor acquired that interest through a series of

---

[2] At an earlier hearing, the Court raised the question whether this proposition is necessarily correct.  Because assumption operates only to bring into the bankruptcy estate the rights and obligations under a prepetition executory contract that were previously the rights and obligations of the prepetition debtor, the Court suggested that it may be appropriate for the Court to permit assumption even in the face of an unresolved dispute about the scope (or even the existence) of the rights and obligations being assumed.  But because both parties agreed that the question whether the debtor had rights and obligations under a lease was logically antecedent to the question whether those rights and obligations may be assumed (such that if the debtor has no rights under an executory contract, a court may not authorize its assumption), the Court is proceeding on the terms agreed to by the parties.

transactions dating back thirty years.    The following facts relating to those transactions are undisputed.

In 1986, Vernon A. Cable and Payless Drug Stores Northwest, Inc. executed a lease that the parties describe as the "Ground Lease."[3]    Pursuant to that lease, Vernon A. Cable, the owner of certain nonresidential real property, leased that property to Payless Drug Stores, the tenant.    Cable Park is the (indirect) successor to Vernon A. Cable, having acquired the underlying real property in a 2015 transaction. The debtor is the (indirect) successor to Payless Drug Stores.    The merits question is a dispute over when that lease expired.

The Ground Lease had a 25-year term (and would have expired in 2012), but granted the tenant eight, five-year extension options, each exercisable until 60 days before the lease's expiration.[4]    In 1996, Payless Drug Stores merged with Thrifty Payless[5] and Thrifty became the new tenant under the Ground Lease.    In December 1998, Thrifty (seeking to monetize a valuable asset, its interest in a below-market rate lease) sold its interest in the Ground Lease to an entity known as RA3 Orangevale LLC.[6]    In order to remain as a tenant in the shopping center, however, Thrifty leased back from RA3 Orangevale the right to occupy the space.[7]    The parties refer to Thrifty's lease of the space from RA3 Orangevale as the "Building Lease," in

---

[3] Cable Park Ex. 16, Ground Lease.    Exhibits introduced into evidence in connection with the July 26, 2023, hearing are cited as "Cable Park Ex. _" and "Debtor Ex. _."

[4] *Id.* § 2(d)-(e).

[5] D.I. 10 at 4.    Thrifty Payless is referred to as "Thrifty."

[6] RA3 Orangevale is at times referred to in the abbreviated form "RA3."

[7] D.I. 10 at 4.

order to distinguish it from the "Ground Lease" under which RA3 Orangevale was now the tenant.

In order to carry out the sale-leaseback transaction, the parties executed a series of documents, including an assumption and assignment agreement (which is dated December 7, 1998 but whose effective date is disputed) through which Thrifty assigned its leasehold interest in the Ground Lease to RA3,[8] and the new Building Lease outlining Thrifty and RA3's roles as sub-lessee and sub-lessor, respectively.[9]

In addition, in order to finance its purchase of Thrifty's tenancy interest, RA3 borrowed $4.3 million from PW Real Estate Investments (a Paine Weber affiliate),[10] secured by RA3's newly acquired interest in the Ground Lease.[11]  In the end, RA3 emerged as the tenant under the Ground Lease and the lessor under the Building Lease.  Thrifty, having sold its interest in the Ground Lease, remained in physical possession of the space as the tenant under the Building Lease.  The debtor is the ultimate successor to RA3 as the tenant under the Ground Lease and lessor under the Building Lease.  As noted above, Cable Park is the ultimate successor to Vernon A. Cable, and is the owner of the underlying real property and lessor under the Ground Lease.  CVS Caremark Corp. is the ultimate successor to Thrifty as the tenant under the Building Lease.

---

[8] Cable Park Ex. 17.

[9] Cable Park Ex. 18, "Building Lease."

[10] PW Real Estate Investments is herein referred to as the "Lender."

[11] Cable Park Ex. 19.

The case before the California court arises out of a disagreement between the parties as to *when* Thrifty assigned its interest in the Ground Lease to RA3 — which turns on when the assumption and assignment agreement became effective. The two candidates are December 7, 1998 and December 11, 1998. The resolution of this issue appears to be outcome determinative of the question whether the Ground Lease remains in place today. The reason those four days are so critical is that it appears that on December 10, 1998, a representative from Thrifty sent a letter to Cable Park's predecessor-in-interest purporting to exercise all eight options under the Ground Lease and thus extend the lease through 2052.[12] If Thrifty was still the tenant under the Ground Lease on that date (as the debtor contends), the Ground Lease remains in place.

The following day, a representative from RA3 sent a similar letter, seeking to exercise two of the eight options and extend the lease for ten years, thus allowing the lease to expire on July 23, 2022.[13] If Thrifty's assignment of the Ground Lease to RA3 was effective on December 7, 1998 (as Cable Park contends), then Thrifty's December 10, 1998 letter accomplished nothing, and the Ground Lease has by now expired.

The debtor's position is that while the assumption and assignment agreement was dated December 7, the sale-leaseback transaction did not close until December 11 and the transaction did not become effective until that date. The debtor argues that in a real estate closing like this one, the various transaction documents

---

[12] Cable Park Ex. 22; Debtor Ex. 9.

[13] Cable Park Ex. 23; Debtor Ex. 8.

(including the assumption and assignment agreement) would have been held in escrow by the title agent until the time of the closing, and would not have been released until the December 11 closing.  If that is right, then Thrifty validly exercised all eight options on December 10, and the Ground Lease would remain in effect until 2052.

No one appears to contend that any of the documents is a forgery or otherwise inauthentic.  The parties seem to agree that each of the documents is what it purports to be.  The question turns on the legal effectiveness of the documents, which ultimately boils down to whether the December 7, 1998 transaction documents became effective on December 7, or were held in escrow until the sale-leaseback transaction closed on December 11, and did not become effective until released from escrow.  Because (as set forth in the caselaw described below) the Court must, in connection with a motion for relief from stay, engage in at least a cursory examination of the merits of the underlying dispute, the Court will lay out the parties' factual arguments below, as well as the documents on which the parties rely in support of their positions.

### 1.    Cable Park's position

Cable Park raises three arguments in support of its view that Thrifty did not properly exercise all eight options on December 10, 1998: (1) that the absence of the December 10 letter from Cable Park's files (obtained in its 2015 acquisition) suggest that it was not sent; (2) that the documentation of the sale-leaseback transaction is consistent with the lease expiring in 2022; and (3) that Thrifty executed tenant-

estoppel certificates indicating both that it was no longer a party to the Ground Lease as of December 8, 1998 and that the Ground Lease was set to expire in 2022.

*First*, Cable Park maintains that Thrifty's December 10 letter was not included among its business records. At the July 26 hearing, Cable Park elicited testimony from Jay Kerner, an employee of U.S. Realty Partners, Inc., which effectively manages Cable Park. Kerner, who testified that he is familiar with the circumstances surrounding Cable Park's 2015 acquisition of the underlying real property (through which Cable Park became the lessor under the Ground Lease), described the due diligence conducted by Cable Park in connection with that acquisition. Specifically, Kerner described the contents of Cable Park's "acquisition file" – a compilation of documents on which Cable Park relied in deciding whether to acquire the real property. Kerner testified that RA3's December 11, 1998 letter was included in the acquisition file, but that Thrifty's December 10 letter was not. Additionally, Kerner explained that Cable Park's acquisition file contained a correspondence between Vernon A. Cable Trust, Cable Park's predecessor, and its counsel, referencing RA3's December 11 letter and informing Cable Park's predecessor that the Ground Lease was set to expire in July of 2022.[14] By contrast, Kerner testified that the acquisition file made no reference at all to any December 10 letter by Thrifty purporting to extend the lease to 2052.

Kerner added that the absence of a letter extending the Ground Lease through 2052 is not surprising. In his experience as manager of various acquisition

---

[14] Cable Park Ex. 27(f).

companies, Kerner testified that tenants typically seek to preserve optionality and therefore wait to exercise their options until it is clear that staying on the premises makes economic sense.  Exercising eight, five-year options at once, Kerner explained, would be highly unusual in a commercial real estate transaction.

*Second*, Cable Park points to several documents executed in connection with the sale-leaseback transaction in support of its position.   At the July 26 hearing the parties introduced into evidence dueling versions of the assumption and assignment agreement.  Although both documents are dated December 7, one of these versions contains additional notarizations suggesting that certain signatories did not affix their signatures until December 10 and 11, 1998.  Whichever version of this document should be seen as controlling, of course, is a merits question best decided by the appropriate court.

Cable Park also relies on the Building Lease executed between Thrifty and RA3, which describes Thrifty's interest in the Ground Lease as having been assigned to RA3 "immediately prior to the execution and delivery" of the Building Lease.[15] Because the Building Lease was executed on December 7, 1998, Cable Park argues, the assignment of Thrifty's interest to RA3 must have occurred on or before that date. Additionally, the Building Lease includes an amortization schedule for payments owed under the loan between RA3 and the Lender.[16]  Under the terms of the schedule,

---

[15] Cable Park Ex. 18 at CABLE_000007.

[16] *Id*. at CABLE_000054.

payments owed under the loan were set to mature in 2021, although the schedule reflects a balance owed at the end of that year.

Finally, Cable Park argues that the documents executed in connection with the Lender's financing of the sale-leaseback transaction support its position. Specifically, § 2.02 of the Loan Agreement, signed by RA3 and the Lender, requires that, as a condition precedent to the Lender extending the needed financing, all "Operative Documents shall have been duly authorized, executed and delivered by the respective parties thereto."[17] The term "Operative Documents" is defined to include the Building Lease which, as noted above, contains a representation that RA3 had already acquired Thrifty's tenancy interest. Additionally, in a Warranties and Representation Agreement, executed by Thrifty and RA3 on December 7 and designed to induce RA3 to purchase Thrifty's interest in the Ground Lease, Thrifty represented that the current term of the Ground Lease was set to expire on July 30, 2012, but that the term may be extended *by RA3*.[18] According to Cable Park, this suggests that, by December 7, 1998, Thrifty's rights under the Ground Lease would have been assigned to RA3.

*Third*, after the sale-leaseback transaction closed, Cable Park (and its predecessors) received Tenant Estoppel Certificates from Thrifty and its successors representing that, as of December 8, 1998, Thrifty was no longer a tenant under the Ground Lease. Kerner testified that, in practice, these certificates are issued by a

---

[17] Cable Park Ex. 19 at 3.

[18] Cable Park Ex. 21 at 9.

tenant-in-possession to an interested third party in order to help the third party understand the terms of the lease.  Thus, although Thrifty was not a tenant under the Ground Lease, as tenant-in-possession, Thrifty was the appropriate party to issue these certificates.  The first certificate was issued by Thrifty on March 10, 1999, wherein Thrifty represented that "[o]n or about December 8, 1998, Thrifty assigned all of its right, title and interest as Tenant under the [Ground] Lease to [RA3]."[19]  The second certificate, provided by Thrifty on August 11, 1999, contains identical representations.[20]  The final certificate was issued on October 14, 2015, in connection with Cable Park's acquisition of the property.  That certificate (issued by Longs Drug Stores California, L.L.C., Thrifty's successor-in-interest), states that, as of the date of the certificate, the Ground Lease was set to expire on July 23, 2022, and that the lease had not been modified.[21]

Cable Park argues that all of these documents, taken together, tell the same story: Thrifty did not properly exercise all eight options to extend the Ground Lease through 2052.  Not only would this have been impractical for tenants who wish to preserve optionality, Cable Park explains, but all the relevant documentation supports the view that, even if Thrifty did send its December 10 letter to Cable Park's predecessor, it did so without proper authority (having already assigned its interest in the Ground Lease to RA3 in the assumption and assignment agreement).  Further,

---

[19] Cable Park Ex. 25(b) at CABLE_000088.

[20] Cable Park Ex. 25(d).

[21] Cable Park Ex. 25(a) at CABLE _000095.

every Estoppel Certificate issued by Thrifty as tenant-in-possession, the same tenant who allegedly extended the Ground Lease on December 10, contains representations by that tenant that it had assigned its rights to RA3 as of December 7.

### 2.    Debtor's position

Debtor's position also boils down to three principal arguments: (1) that despite documents dated to the contrary, Thrifty was still the tenant under the Ground Lease until the transaction closed on December 11, 1998; (2) that by December 11, 1998, RA3 had already assigned its interests under the Ground Lease to the Lender, such that RA3's December 11 letter extending the lease by two terms could not have been effective; and (3) that the fact that the loan would not be paid off by 2022 suggests an understanding that the lease would extend beyond that time.

*First*, the debtor argues that Thrifty retained its rights as tenant under the Ground Lease until the sale-leaseback transaction closed on December 11, 1998. This argument requires the debtor to prove two things: (1) that the documents signed in connection with the sale-leaseback transaction did not become effective until the closing date, and (2) that December 11 was, in fact, the closing date.

As to the first point, the debtor relies on testimony elicited at the July 26 hearing from Richard. J Sabella, the debtor's manager, who testified that he previously served as the head of the real estate practice at Cahill Gordon & Reindel, a leading New York law firm. Sabella recognized that various documents executed in connection with the sale-leaseback transaction were signed in different locations and on different dates, and that certain of the documents were dated before December 11. He testified, however, that it is customary in commercial real estate transactions

for the parties and their representatives to execute the documents in this manner, rather than to gather in a single place and time for a physical closing.  In a virtual closing such as the one he says occurred here, Sabella testified that it is customary, once all the signatures have been received, for the documents to be sent to a title company where they are held until the point of the "closing."  Until the closing actually occurs and the signatures are released from escrow, Sabella said that the practice is that the documents are not legally effective.

Sabella explained that his understanding was based, in part, on his own acquisition of the debtor in 2003.  In connection with that acquisition, Sabella reviewed a "closing binder" compiled by Merchant Equity (RA3's parent company) that contained all the relevant documentation relating to the sale-leaseback transaction.[22]  Sabella's review of the due diligence documents contained in the binder, including records evidencing the closing agent's delivery of documents, led him to believe that the parties did not intend for these documents to become effective until the closing.

As further evidence that the parties intended for Thrifty to remain as tenant under the Ground Lease until closing (such that it would have the authority to send the December 10 letter extending the lease until 2052), the debtor relies on a Real Property Estoppel Certificate delivered to the Lender by Vernon A. Cable (the original Landlord under the Ground Lease and Cable Park's predecessor-in-

---

[22] Debtor Ex. 36.

interest).[23]   The certificate, dated December 8, 1998, confirms that, as of that date, Thrifty was the lawful tenant under the Ground Lease.

For the proposition that the transaction in fact closed on December 11, 1998, the debtor introduced into evidence a series of documents consistent with that proposition, including a copy of a title commitment issued by First American Title Insurance Company.[24]   Sabella stated that these commitments are issued as a way of protecting real estate purchasers from any deficiencies in title.   Sabella further testified that the commitment document produced by the debtor was, in fact, two documents – a copy of an initial commitment issued one week prior to closing and a "marked commitment," which is customarily issued by the title closer on the date of the closing.   That date – the date recorded on the title commitment policy – was December 11, 1998.   In other words, because a marked commitment is issued at closing, debtor argues, this policy is strong evidence that the closing occurred on December 11.

The debtor also introduced a letter sent by John Mannix, owner of RA3, to Vernon A. Cable Trust (the original landlord) wherein Mannix represents to the landlord that "[o]n December 11, 1998, the sale-leaseback transaction between Thrifty Payless, Inc. … and RA3 Orangevale LLC closed."[25]   Additionally, the debtor submitted a closing statement issued by First American Title Insurance Company

---

[23] Debtor Ex. 5.

[24] Debtor Ex. 16.

[25] Debtor Ex. 8; Cable Park Ex. 23.

(acting as closing agent) evidencing, among other things, the extension of credit from the Lender to RA3.[26]  The closing letter was dated December 11, 1998.  During cross-examination, Cable Park's witness acknowledged that the Lender would not have advanced the funds before the closing of the transaction.

*Second,* debtor argues that the letter sent by RA3 on December 11, 1998 (which purports to extend the lease by only two terms, to 2022), cannot override Thrifty's decision to exercise all eight options because RA3 did not have the authority to extend the lease when it sent its letter.  As part of the Lender's decision to finance the sale-leaseback transaction, RA3 was required to convey to the Lender a first mortgage lien on RA3's interest in the Ground Lease, along with RA3's rights to exercise the extension options.  This conveyance, Sabella testified, is reflected in a leasehold deed of trust signed on December 10, 1998, by RA3, the Lender, and First American Title Insurance Company.[27]  Pursuant to that agreement,  the "Grantor," defined as RA3, conveyed to the Lender "all estate, right, title and interest in ... the Ground Lease … including the rights to exercise options [or otherwise] extend or terminate the Ground Lease …"[28]  Sabella explained that, as he understood it, this deed of trust operated to convey all of RA3's rights to the Lender as of the date the deed of trust was signed.  Accordingly, Sabella argued, after December 10, 1998, RA3 lacked the authority to take any action with respect to the Ground Lease without the Lender's consent.

---

[26] Debtor Ex. 13.

[27] Debtor Ex. 6.

[28] *Id*. at DEBTOR00238.

14

Various other documents, Sabella continued, further support the debtor's view that RA3 had assigned its rights under the Ground Lease to the Lender as of December 11. For example, the debtor produced a subordination agreement executed between the Lender, RA3, and Thrifty, wherein the parties represented that, as of the date the document was signed, "all rights of the Lessee thereunder, are now, and shall at all times continue to be, subject and subordinate in all respects to the Mortgage and the lien thereof."[29]  The subordination agreement was signed by the final signatory on December 10, 1998.  Additionally, the closing certificate issued by RA3 in order to secure the needed finance from the Lender stated that, as of December 11, all the documents relating to the sale-leaseback transaction were in full effect, including the subordination agreement and the deed of trust.[30]  Finally, counsel for RA3 issued two opinion letters that were premised on the assumption that, as of December 11, RA3 had executed and delivered all documents relating to the sale-leaseback transaction – including the deed of trust – and that such documents were fully enforceable.[31]  One of these letters contained an attached affidavit from John Mannix, owner of RA3 and a party to the original transactions, certifying that the facts relied on by counsel in these opinion letters are true, including the fact that the deed and subordination agreement were effective as of December 11.  This, Sabella testified, should be dispositive, as it is evidence from an

---

[29] Debtor Ex. 10 at DEBTOR00379.

[30] Debtor Ex. 12.

[31] Debtor Exs. 14-15.

original party that RA3 had assigned its rights under the Ground Lease to the Lender as of December 11.

*Third*, the debtor emphasizes the amortization schedule attached to the promissory note executed between RA3 and the Lender, which outlines RA3's payment obligations under the loan agreement.[32]  That schedule indicates that there would be an outstanding balance on RA3's loan totaling $1.38 million as of January 2021.  The debtor argues that, as a commercial matter, a lender would not make a loan to an entity that held only a leasehold interest in property if that loan would not be paid off before the expiration of the leasehold interest.  Accordingly, Sabella testified that he expects that the Lender would have demanded that Thrifty exercise all eight options in order to allow RA3 to fulfill its loan obligations.

### 3.     The California action

The debtor sued Cable Park in September 2022 in California Superior Court alleging that Cable Park was breaching the covenant of quiet enjoyment by attempting to remove the debtor from the property.  Shortly thereafter, the debtor sought a temporary restraining order to prevent Cable Park from taking further legal action against the debtor.  The California court denied the debtor's request.[33]  A year later, Cable Park initiated its own unlawful detainer action in the Superior Court, seeking restitution of the premises.  Before that case was set for trial, the debtor

---

[32] Debtor Ex. 17 at DEBTOR00089; Cable Park Ex. 18 at CABLE_000054.

[33] D.I. 10 at 7.

sought two more temporary restraining orders, both of which were denied by the California court.

The day before trial was set to begin, the debtor filed this bankruptcy case. Cable Park now seeks, among other things, an order from this Court lifting the automatic stay and allowing the trial to proceed in the California court.

## Jurisdiction

This Court has subject-matter jurisdiction over this dispute under 28 U.S.C. § 1334(b).  As a case within the district court's bankruptcy jurisdiction, it has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference.[34]  A motion for relief from stay is a core matter under § 157(b)(2)(G).

## Analysis

11 U.S.C. § 362(a) provides that the filing of a petition operates to stay, among other things, the continuation of a judicial "action or proceeding against the debtor that was … commenced before the commencement of the case."  The point of the automatic stay is, among other things, to provide the debtor "a breathing spell from creditors by stopping all collection efforts, all harassment, and all foreclosure actions."[35]  Still, the stay is not absolute, and "a bankruptcy court with jurisdiction

---

[34] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[35] *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).

over a debtor's case has the authority to grant relief from the stay of judicial proceedings against the debtor."[36]

Under § 362(d)(1), stay relief may be granted for "cause," and although "cause" is not defined by the Bankruptcy Code, courts in this jurisdiction have traditionally looked to a three-part balancing test to determine whether cause exists.  That test, set forth in *In re Rexene Products Co.*,[37] focuses on whether relief from stay would prejudice the estate, the balance of hardships if relief is granted, and the movant's likelihood of success on the merits in the non-bankruptcy forum.  The Second Circuit's decision in *In re Sonnax Indus.* makes a similar point, articulating twelve factors courts should evaluate when considering a request for stay relief.[38]  Similarly, the district court decision in *In re Flintkote Co.*, describes the applicable standard as one that involves a consideration of the "totality of the circumstances."[39]  Paraphrasing these principles, this Court has suggested that the "analysis ultimately boils down to a common-sense judgment about whether it makes good sense to have the case proceed in the court where it was pending as opposed to being heard by the bankruptcy court."[40]

---

[36] *Id.*

[37] 141 B.R. 574 (Bankr. D. Del. 1992).

[38] 907 F.2d 1280, 1286 (2d Cir. 1990).

[39] 533 B.R. 887, 894 (D. Del. 2015).

[40] *In re Medical Tech. Assocs. II*, No. 22-50389 (CTG), 2022 Bankr. LEXIS 3088 at *15 (Bankr. D. Del. Nov. 2, 2022).

I.    **Both sides have at least colorable claims on the merits.**

Under each of these standards, the cases make clear that a court should take at least some account of the merits of the claim.  Litigation involves expense.  Any motion to lift the stay involves a determination that it is appropriate to require the debtor to spend estate resources in litigation outside of bankruptcy.  Where, for example, a creditor seeks to liquidate a prepetition claim outside of bankruptcy, but it is clear to the bankruptcy court that the non-bankruptcy litigation would be very expensive and the creditor's claim is a very weak one, a court may well exercise its discretion to find that the claim is more properly liquidated in the bankruptcy case through the (presumably more efficient) claims allowance process.

As set forth above, the Court has considered both sides' positions on the merits of the ownership dispute.  The dispute is quite interesting.  Based on the evidence this Court considered, it is clear that both parties have perfectly reasonable arguments to make.  This is not a dispute in which the party seeking stay relief has a claim that is so weak that the debtor should be spared the expense of dealing with it outside of bankruptcy.  Cable Park has a perfectly plausible argument that the debtor's lease is expired because Thrifty conveyed its interest in the Ground Lease to RA3 on December 7, 1998, rendering Thrifty's letter three days later exercising the right to extend the lease until 2052 a legal nullity.  That said, the debtor also has a perfectly reasonable argument, based on its view of custom and practice in real estate transactions, that this transaction closed on December 11, 1998, and that none of the transaction documents was effective until that closing occurred.  Those contentions

are sufficiently substantive that they certainly warrant a court's careful consideration.  The question, then, is which court.

## II.    The particular context in which this dispute arises imposes a burden on the debtor to explain why stay relief should not be granted.

Because of the breadth of the automatic stay, motions for stay relief arise in many different contexts.  And in this Court's view, the context of the work being done by the automatic stay in a particular case is critical to how a Court ought to consider a motion seeking stay relief.  The Bankruptcy Code does this expressly in certain contexts, explaining, for example, that where stay relief is sought for the purpose of permitting a creditor to foreclose on property in which it has a security interest, courts should look to whether the debtor has equity in the property and whether the property is necessary to the debtor's reorganization.[41]

*Rexene* itself arose in the context of a creditor that was seeking stay relief to liquidate a prepetition claim against the debtor in the court in which a prepetition lawsuit against the debtor had been pending.  In that context, the balancing of factors takes account of the fact that, on the one hand, there is another court that may have developed familiarity with the claim by presiding over the lawsuit before the bankruptcy (and may even have specialized expertise in a particular area of law), while, on the other, the more elaborate procedures and protections associated with non-bankruptcy litigation may be unduly costly to the estate when the claim is likely to be paid in fractional bankruptcy dollars.

---

[41] 11 U.S.C. § 362(d)(2).

Similarly, courts should consider the context when addressing a motion for relief from stay to permit a party to pursue counterclaims outside of bankruptcy.  For example, where the debtor initiates a prepetition suit against a defendant (which is not subject to the stay) and that defendant asserts certain counterclaims in the same case, courts should be cognizant of the fact that, while the defendant's counterclaims are subject to the automatic stay, in practice it may make sense to allow both claims to proceed outside of bankruptcy to ensure that the same facts are not litigated twice and that one side is not forced into a fight with one hand tied behind its back.[42]

In this case, the context is a dispute between the debtor and a third party over ownership of an asset that is critical to the debtor's business.  In considering how a court should weigh a request for stay relief that arises in that context, it bears note that (unlike the liquidation of a prepetition claim against the estate) such an ownership dispute can equally arise in a case in which the debtor is the plaintiff.  And while there is no question, in view of the text of the Bankruptcy Code, that the automatic stay applies when the debtor is the defendant (since it is a lawsuit commenced against the debtor before the petition date), it is certainly relevant that the applicability of the automatic stay is largely a function of happenstance.  A substantively identical suit over ownership of the same asset would not be subject to the automatic stay if the debtor was the party who happened to initiate the litigation by filing suit as the plaintiff.

---

[42] *See, e.g., Zweygardt v. Colorado Nat'l Bank of Denver*, 51 B.R. 214 (Bankr. D. Colo. 1985).

For that reason, the work being done by the automatic stay in this context is *not* to ensure the centralization of disputes in a single forum (as might be said about claims allowance). Rather, as noted above, the automatic stay is primarily operating to grant the debtor a breathing spell from the press of non-bankruptcy litigation. Accordingly, while every motion for relief from stay will turn on the particular facts and circumstances of the case, the case for granting stay relief is a relatively strong one when the debtor is not, in fact, seeking to obtain a breather from that litigation, but instead intends to pursue the very same litigation, only in a different forum.

When that is the case, a court considering a motion for stay relief must necessarily be concerned, at some level, that the bankruptcy filing may be operating as a last-ditch effort by the debtor to stave off impending defeat in another forum. While that concern may be more attenuated when the bankruptcy case is filed months before the likely trial date in another forum, the circumstances present here – a petition filed on the immediate eve of trial – necessarily call out for more careful scrutiny.

This set of concerns raises two other fundamental bankruptcy principles. First is the principle reflected in the cases on the good-faith use of the bankruptcy process, which is intended to guard against the use of bankruptcy as a litigation tactic.[43] One can assume, for this purpose, that a debtor at risk of losing a dispute over an asset that is critical to its business is in sufficient financial distress to justify access to

---

[43] *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

bankruptcy relief.[44]  But even if the dismissal of the bankruptcy case may be too blunt an instrument, the concern reflected in *SGL Carbon* and its progeny about the use of the tools of bankruptcy for a purpose unrelated to its fundamental objective – such as a means to obtain a tactical litigation advantage – must certainly be borne in mind.

Second is the related notion, reflected in *Board of Trade of City of Chicago v. Johnson*,[45] that the filing of a bankruptcy case should not change the nature of a debtor's interest in property.  Property of the estate under § 541 is what the debtor owned immediately before the bankruptcy case – neither more nor less.  If a debtor is indeed using the bankruptcy filing as a litigation tactic to obtain a potentially more favorable forum for resolving a dispute over ownership of an asset, this raises the concern that the bankruptcy process is being used in a way that is inconsistent with this principle.

None of this is intended to suggest the existence of any hard and fast rule.  The statutory term "cause" is necessarily a flexible one, as are the *Rexene* and *Sonnax* standards that seek to guide its application.  But at least in this Court's view, when the debtor files a bankruptcy case immediately on the eve of trial in a dispute over ownership of the debtor's critical assets, these circumstances (and the risk of misuse

---

[44] *See id.* at 164 ("Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability."); *In re LTL Management, LLC*, 58 F.4th 738, 756 (3d Cir. 2023) (relying on bankruptcy courts to distinguish between a prudent "early filing" and an inappropriate "premature filing").

[45] 264 U.S. 1 (1924).  *See also Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

of the bankruptcy process) make it incumbent on the debtor to provide good reasons why stay relief should not be granted.

This Court certainly will not undertake to catalog every reason that might suffice as a means of meeting that burden. But this Court reads Judge Gross' decision in *In re SCO Group* to provide at least one example.[46] That case involved a bankruptcy petition filed on the eve of trial in a district court. The issues presented for trial included whether the debtor was permitted to enter into license agreements that were at the core of its business. The court granted relief from the stay for that purpose, though denied stay relief on the question whether certain cash held by the debtor was subject to a constructive trust. In this Court's view, that result makes good sense. While the rationale was not articulated in *SCO* using precisely this language, questions of constructive trust are inherently inter-creditor disputes. The issue in a constructive trust case is whether one creditor is entitled to priority over other creditors with respect to certain assets. Once a bankruptcy case is filed, it certainly makes sense for the bankruptcy court, who has all of the potentially affected creditors before it, to be the court to resolve such an intercreditor dispute.

## III. On the record before this Court, the debtor has not met its burden to show why relief from the stay should not be granted.

Nothing in the record before this Court, however, is sufficient to permit the debtor to meet the burden it faces in light of the circumstances of this filing. Here, trial on the Cable Park's unlawful detainer action was set to start on May 30, 2023,

---

[46] 395 B.R. 852, 857 (Bankr. D. Del. 2007).

one day after the debtor filed its bankruptcy petition.  In addition, Cable Park

maintains that the California court is better situated to resolve this dispute since the

issues pertaining to Cable Park's detainer suit have been extensively briefed in the

California court, both parties have retained California counsel, and the debtor was

an active participant in the California proceedings as evidenced by the debtor's

attempts to secure a TRO.[47]  Conversely, the debtor has not presented a compelling

reason as to why the case should proceed before this Court.  Indeed, the only harm

articulated by the debtor in its papers to allowing this case to go forward in California

is that, given the expedited nature by which the California Superior Court sets cases

for trial, the debtor would be forced to litigate this case without an opportunity to

take meaningful discovery.[48]  That argument is underwhelming.  It is not this Court's

role to second-guess the procedures adopted by the California courts to enforce rights

arising under California law.  And while the parties spar over the question whether

"unlawful detainer" is the proper procedure under California law where the challenge

is to legal possession rather than physical possession, that is certainly a matter that

is best left to the California Superior Court.

---

[47] D.I. 10 at 11.

[48] In fairness, the debtor also argues that stay relief will harm its ability to engage with its various stakeholders in one consolidated forum.  Specifically, once this ownership dispute is resolved, the debtor intends to work with its Lender, the Building Lease tenant, and Cable Park on various ancillary matters, such as the debtor's ability to fulfill its obligations under the Loan Agreement and potential cure costs to assuming the Ground Lease if it's determined to remain effective.  The California action, however, is a two-party dispute – the fact that other parties may have an interest in the outcome of such a dispute does not transform the nature of that dispute.  In any event, the motion addressed herein does not seek the dismissal of the bankruptcy case.  The debtor certainly reserves the right to argue that the case serves a valid reorganizational purpose on account of the issues involving other parties that would need to be addressed following the state court's resolution of the ownership dispute.

At bottom, it is a confluence of factors that guide the Court's decision. Specifically, the fact that (1) this petition was filed on the eve of trial, (2) the California Superior Court is familiar with these proceedings and has already decided issues relating to the case, (3) the debtor has failed to set forth a compelling reason to keep the stay in place, and (4) the only harm the debtor will suffer raises concerns over forum shopping. Taken together, there is sufficient cause to lift the stay.

The Court might have reached a different conclusion if the action pending in the California court was not yet "trial ready," such that resolution in that forum would take longer than resolution by this Court, or if (as with the constructive trust question in *SCO*) the dispute raised questions that a bankruptcy court were uniquely positioned to address.

In this case, however, the Court concludes, as Judge Balick did in *Rexene*, that it is "more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum."[49]

---

[49] 141 B.R. at 576.

**Conclusion**

For the foregoing reasons, the Court will grant the motion for relief from stay.

The parties are directed to settle an order so providing.


Dated: August 8, 2023

_____

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE